1
2
3
4
5
6
7
8             **UNITED STATES DISTRICT COURT**
9             **EASTERN DISTRICT OF CALIFORNIA**
10

11  VERONICA CAMPA,                        )  Case No.: 1:14-cv-01919 - JLT
                                            )
12           Plaintiff,                     )  ORDER DIRECTING ENTRY OF JUDGMENT IN
                                            )  FAVOR OF DEFENDANT, CAROLYN COLVIN,
13      v.                                  )  ACTING COMMISSIONER OF SOCIAL
                                            )  SECURITY, AND AGAINST PLAINTIFF
14  CAROLYN W. COLVIN,                      )  VERONICA CAMPA
    Acting Commissioner of Social Security, )
15                                          )
             Defendant.                     )
16  _____ )

17          Plaintiff Veronica Campa asserts she is entitled to disability insurance benefits and

18  supplemental security income under Titles II and XVI of the Social Security Act.  Plaintiff argues the

19  administrative law judge erred in evaluating the medical record and finding her subjective complaints

20  lacked credibility.  Because the ALJ applied the proper legal standards and the decision is supported by

21  substantial evidence in the record, the administrative decision is **AFFIRMED**.

22                              <u>**BACKGROUND**</u>

23          Plaintiff filed applications for benefits in 2011 and 2012, in which she alleged disability

24  beginning October 1, 2010.  (Doc. 9-3 at 21)  The Social Security Administration denied the

25  applications at the initial level and upon reconsideration.  (*Id.*; Doc. 10-5 at 2-6, 10-14)  Plaintiff

26  requested a hearing, and testified before an ALJ on April 19, 2013.  (Doc. 9-3 at 21, 43)  The ALJ

27  determined Plaintiff was not disabled under the Social Security Act, and issued an order denying

28  benefits on May 31, 2013.  (*Id.* at 21-32)  Plaintiff filed a request for review of the decision with the

1   Appeals Council, which denied the request on October 8, 2014.  (*Id.* at 2-4)  Therefore, the ALJ's

2   determination became the final decision of the Commissioner of Social Security.

3   **STANDARD OF REVIEW**

4       District courts have a limited scope of judicial review for disability claims after a decision by

5   the Commissioner to deny benefits under the Social Security Act.  When reviewing findings of fact,

6   such as whether a claimant was disabled, the Court must determine whether the Commissioner's

7   decision is supported by substantial evidence or is based on legal error.  42 U.S.C. § 405(g).  The ALJ's

8   determination that the claimant is not disabled must be upheld by the Court if the proper legal standards

9   were applied and the findings are supported by substantial evidence.  *See Sanchez v. Sec'y of Health &*

10  *Human Serv.*, 812 F.2d 509, 510 (9th Cir. 1987).

11      Substantial evidence is "more than a mere scintilla.  It means such relevant evidence as a

12  reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S.

13  389, 401 (1971) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197 (1938)).  The record as a whole

14  must be considered, because "[t]he court must consider both evidence that supports and evidence that

15  detracts from the ALJ's conclusion."  *Jones v. Heckler*, 760 F.2d 993, 995 (9th Cir. 1985).

16  **DISABILITY BENEFITS**

17      To qualify for benefits under the Social Security Act, Plaintiff must establish she is unable to

18  engage in substantial gainful activity due to a medically determinable physical or mental impairment

19  that has lasted or can be expected to last for a continuous period of not less than 12 months.  42 U.S.C.

20  § 1382c(a)(3)(A).  An individual shall be considered to have a disability only if:

21          his physical or mental impairment or impairments are of such severity that he is not only
            unable to do his previous work, but cannot, considering his age, education, and work
22          experience, engage in any other kind of substantial gainful work which exists in the
            national economy, regardless of whether such work exists in the immediate area in
23          which he lives, or whether a specific job vacancy exists for him, or whether he would be
            hired if he applied for work.
24

25  42 U.S.C. § 1382c(a)(3)(B).  The burden of proof is on a claimant to establish disability.  *Terry v.*

26  *Sullivan*, 903 F.2d 1273, 1275 (9th Cir. 1990).  If a claimant establishes a prima facie case of disability,

27  the burden shifts to the Commissioner to prove the claimant is able to engage in other substantial

28  gainful employment.  *Maounis v. Heckler*, 738 F.2d 1032, 1034 (9th Cir. 1984).

**ADMINISTRATIVE DETERMINATION**

To achieve uniform decisions, the Commissioner established a sequential five-step process for evaluating a claimant's alleged disability. 20 C.F.R. §§ 404.1520, 416.920(a)-(f).  The process requires the ALJ to determine whether Plaintiff (1) engaged in substantial gainful activity during the period of alleged disability, (2) had medically determinable severe impairments (3) that met or equaled one of the listed impairments set forth in 20 C.F.R. § 404, Subpart P, Appendix 1; and whether Plaintiff (4) had the residual functional capacity to perform to past relevant work or (5) the ability to perform other work existing in significant numbers at the state and national level.  *Id.*  The ALJ must consider testimonial and objective medical evidence.  20 C.F.R. §§ 404.1527, 416.927.

**A.      Relevant Medical Evidence**

On November 4, 2009, Plaintiff reported she had "aching" pain in both knees.  (Doc. 9-8 at 11) She said the pain was "aggravated by movement" and "relieved by pain/RX meds, [over the counter] medicines, ibuprofen and rest."  (*Id.*)  Plaintiff said she did not have "numbness, popping, spasms, swelling, tingling in the arms (and legs) [or] weakness."  (*Id.*)  However, Plaintiff said she had tenderness and pain that disrupted her sleep.  (*Id.*)  Mr. Aaron McCloud, PA-C, determined that Plaintiff had "moderate pain w/ motion" in both knees, and referred Plaintiff for an orthopedic examination.  (*Id.* at 12)

On November 25, 2009, Plaintiff had an orthopedic consultation with Dr. Raymond Pierson "for evaluation of chronic bilateral lower extremity symptoms that initially onset approximately 8-9 years [before]."  (Doc. 9-8 at 2)  Plaintiff reported she had pain in both knees, which was "more severe on the right."  (*Id.*)  She said her right knee occasionally locked and she "experienced quite significant knee swelling" in both knees."  (*Id.*)  Dr. Pierson observed that Plaintiff walked "with a stiff knee gait and mild right-sided limp."  (*Id.* at 3)  Dr. Pierson determined:

> There was on knee effusion present.  Knee range of motion was intact and symmetric.  The ligamentous assessment was unremarkable.  The meniscal assessment was unremarkable.  The patient was noted with patellofemoral crepitus bilaterally; moderate to severe on the right and moderate on the left.  There was also pain with patellofemoral compression; moderate on the right and mild on the left.

(*Id.* at 4) Dr. Pierson concluded the examination "did not demonstrate any significant findings localized to the lateral knee compartment," and recommended that she "proceed with conservative

treatment." (*Id.*) Accordingly, he prescribed Celebrex and Prilosec for Plaintiff. (*Id.*)

Plaintiff had a follow-up appointment with Dr. Pierson on December 23, 2009. (Doc. 9-8 at 5) She reported "she only recently began use of Celebrex within the last week," and she continued to have swelling in her right knee. (*Id.*) Dr. Pierson reviewed radiographs taken of Plaintiff's knees on December 16, and determined "[t]here was evidence for limited osteoarthritic changes, primarily involving the medial and patellofemoral compartments." (*Id.*) He found Plaintiff's "[r]ange of motion remained unchanged" and her knee mobility "remained intact." (*Id.*)

In September 2010, Plaintiff reported she had foot pain that occurred "constantly" and was worsening. (Doc. 9-8 at 18) She described the pain as "aching and burning," and said it caused difficulty going to sleep, numbness and tenderness." (*Id.*) Plaintiff's prescription for Neurontin was increased "to 300 mg three times daily." (*Id.* at 19)

Plaintiff said she had lower back pain beginning in November 2010, which occurred "intermittently" and radiated to the left thigh by December. (Doc. 9-8 at 20) Plaintiff "describe[d] the pain as an ache," which she felt both sitting and walking. (*Id.*) She reported the pain was aggravated by daily activities and "relieved by rest." (*Id.*) Mr. McCloud observed that Plaintiff's gait was not disturbed. (*Id.*) However, he found her spine was "positive for posterior tenderness" and "left tenderness from L4 to S1." (*Id.* at 21) In addition, Plaintiff had "[p]aravertebral muscle spasm." (*Id.*) Plaintiff received a prescription for Baclofen and NSAID, and was encouraged to heat and stretch "as tolerated." (*Id.*)

She again reported having knee pain in February 2011, which she said occurred "intermittently and [was] stable." (Doc. 9-8 at 22) Plaintiff said the pain was "aggravated by bending, climbing (and descending) stairs, movement, walking and standing." (*Id.*) She reported the pain caused "decreased mobility and tenderness," which was relieved by medication and rest. (*Id.*) Mr. McCloud found Plaintiff had "tenderness, mild pain w/ motion" in both her knees. (*Id.* at 23) Mr. McCloud "[d]iscussed the possibility of doing steroid joint injections and gave [her] literature regarding such." (*Id.*)

Plaintiff elected to have the steroid injection, which the doctor performed in April 2011. (Doc. 9-8 at 23) At that time, Mr. McCloud determined Plaintiff had a "[f]ull range of motion" in her left

knee, and the injection was given only in her right knee.  (*Id.* at 24)  At a follow-up appointment two weeks later, Plaintiff reported the pain was "moderate," and was "improving."  (*Id.* at 26)  Mr. McCloud determined Plaintiff continued to have "tenderness, moderate pain w/ motion" in the right knee.  (*Id.* at 27) Accordingly, a second injection was administered into Plaintiff's knee.  (*Id.* at 27)

In May 2011, Plaintiff went to Dr. Alton Smalley, a podiatrist, for treatment.  (Doc. 9-8 at 29). She reported that she had "cramping" pain in her feet for about three weeks.  (*Id.*)  She described a "wadded up sock sensation," which was aggravated by working and standing.  (*Id.*)  Dr. Smalley observed that Plaintiff's gait was normal.  (*Id.* at 30)  He found Plaintiff had normal flexibility in her left and right ankles, though she exhibited tenderness in her left ankle.  (*Id.*)

In June 2011, Dr. Matthew Watson saw Plaintiff for a checkup of her diabetes, which she was diagnosed with in 2007.  (Doc. 9-8 at 32)  He noted Plaintiff's diabetes was "getting worse," though Plaintiff was complying with her medication.  (*Id.*)

Dr. Navjeet Boparai performed a comprehensive neurologic evaluation on January 30, 2012. (Doc. 9-8 at 39)  Plaintiff reported that she had pain in both knees and feet, which she described as "6/10 on average."  (*Id.*)  She described the pain in her feet as "sharp and burning," and the pain in her knees as "constant, sharp, stabbing, aching and burning with swelling."  (*Id.*)  Plaintiff said she used "a single point cane which [was] not prescribed," though she did not bring it to the examination.  (*Id.*) Plaintiff said she was "independent with activities such as dressing, grooming, bathing, toileting and hygiene," but "sometimes she require[d] assistance with tying of her shoes, putting on her socks and pants." (*Id.* at 40)

Dr. Boparai observed that Plaintiff was "able to remove her shoes and put them back on" and "get on and off the exam table."  (Doc. 9-8 at 40)  She noted that Plaintiff "was able to walk into the exam room without assistance," though she had "a globally antalgic gait."  (*Id.* at 40-41)  Dr. Boparai also observed, "She was unable to hop or squat.  She was unable to walk on her toes.  She [was] able to walk on her heels.  She has imbalance with tandem gait."  (*Id.*)  Also, Dr. Boparai found Plaintiff had "tenderness to palpation" over her left foot and right metatarsals and "tenderness over the left medial and lateral joint line as well as the left quadriceps tendon."  (*Id.* at 42)  She concluded Plaintiff was able to sit up to six hours, and stand and walk "[u]p to four hours due to her antalgic gait, imbalance and

chronic knee and foot pain." (*Id.*)  Dr. Boparai believed a cane was "medically necessary… for long distances and uneven terrain." (*Id.* at 43)  According to Dr. Boparai, Plaintiff was able to lift and carry "20 pounds occasionally and 10 pounds frequently," explaining the "limitation is due to the fact that if she is suing a single point cane she only has one upper extremity available for lifting and carrying." (*Id.*)  Further, Dr. Boparai opined Plaintiff "may occasional[ly] climb, balance, stoop, kneel, crouch and crawl" due to her obesity, limited range of motion in her knees, and chronic pain. (*Id.*)  She believed Plaintiff had "no limitations for reaching, handling, fingering or feeling." (*Id.*)

On April 2, 2012, Plaintiff had x-rays taken of her lumbar spine, knees, and hips.  (Doc. 9-8 at 51; Doc. 9-9 at 12)  Dr. Lucy Miller determined the x-rays of Plaintiff's lumbar spine showed "moderate disc space narrowing and hypertrophic spurring throughout," as well as "narrowing and sclerosis of facet joints, most pronounced at L4-5 and L5-S1 bilaterally." (*Id.*)  Dr. Miller found Plaintiff had osteoarthritis in her knees, which was greater in her left knee than right, with "moderate joint space narrowing and hypertrophic spurring." (*Id.*)  In addition, Dr. Miller determined Plaintiff had "[m]ild degenerative changes" in her right hip.  (*Id.*)

Dr. Pierson reviewed the x-rays and evaluated Plaintiff on April 5, 2012.  (Doc. 9-8 at 88)  He observed that Plaintiff "ambulate[d] with a shuffling short-step gait but no definite limp." (*Id.*)  Dr. Pierson determined Plaintiff's left hip had "good mobility without any pain or limitation," and her right hip "move[d] well." (*Id.*)  Plaintiff did not have "localized medial or lateral joint line tenderness" in either knee. (*Id.*)  Dr. Pierson opined that Plaintiff's weight, approximately 260 pounds, was "the most significant problem and she would see significant benefit with any substantial reduction." (*Id.* at 89)  He administered a steroid injection in Plaintiff's left knee, and concluded his plan was "to manage the patient's knee pain conservatively" with medication.  (*Id.*)

Plaintiff had lab tests and an ultrasound in May 2012.  (Doc. 9-8 at 53-54)  Dr. Watson determined Plaintiff's "lab tests were normal, including [her] thyroid and cholesterol levels." (*Id.* at 54)  However, Plaintiff's liver was inflamed.  (*Id.*)  After further testing, Dr. Watson opined that Plaintiff had "a significant hepatitis." (*Id.* at 53)  Plaintiff continued to report "moderate pain and disability" due to her knee pain.  (*Id.* at 87)

On June 8, 2012, Plaintiff was "re-evaluated for her complaints of bilateral knee pain" by Dr.

6

Pierson. (Doc. 9-8 at 84) Plaintiff reported her medication "did not provide significant relief," and she "continue[d] to have significant bilateral knee complaints." (*Id.*) Dr. Pierson observed that Plaintiff "was holding her right wrist," and upon question reported "a chronic history of right wrist pain." (*Id.*) She said she "was first evaluated for [pain] in the early 90s at which time radiographs apparently were interpreted to demonstrate arthritis." (*Id.*) Plaintiff "describe[d] long-term limitation of wrist region motion" and said her wrist was "intermittently painful." (*Id.*) Dr. Pierson determined Plaintiff "definitely [had] limitation of wrist region motion" and fitted her with a splint. (*Id.* at 85)

Dr. Watson completed a residual functional capacity questionnaire on June 14, 2012. (Doc. 9-8 at 57-58) He noted Plaintiff had been diagnosed with diabetes, hypertension, sleep apnea, hypothyroidism, and chronic pain. (*Id.* at 57) Dr. Watson indicated Plaintiff suffered from "diabetic neuropathy, bilateral knee/wrist pain, fatigue, [and] chronic back pain." (*Id.*) He believed Plaintiff would need to recline or lie down in excess of the typical rest and meal breaks in a workplace. (*Id.*) According to Dr. Watson, Plaintiff was able to walk 4-5 city blocks, sit 45 minutes at one time and a total of six hours in an eight-hour day, and stand/walk for 10 minutes at one time and a total of one hour in an eight-hour day. (*Id.*) He indicated Plaintiff was able to lift ten pounds frequently and twenty pounds occasionally, but had limitations with reaching, handing and fingering. (*Id.* at 58) Specifically, Dr. Watson believed Plaintiff was limited to using her right hand for grasping, turning, twisting, and fine manipulation only 25% of an eight-hour workday, and reaching for 75% of the workday. (*Id.*)

Plaintiff had x-rays taken of her right wrist on June 19, 2012, due to her reports of "chronic wrist pain." (Doc. 9-8 at 61; Doc. 9-9 at 9) Dr. Lincoln Russin determined Plaintiff had "degenerative changes in the radiocarpal articulation, and . . . some deformity of the distal radius with slight dorsal angulation of the distal radius articular surface." (*Id.*) Dr. Russin concluded Plaintiff had "[a]rthritic changes in the wrist" with "[s]light deformity of the distal radius, probably signifying an old healed facture." (*Id.*)

On August 17, 2012, Dr. Pierson noted Plaintiff reported she was "getting moderate relief" with her medication, and her knees were "not too bad." (Doc. 9-8 at 82) Dr. Pierson examined Plaintiff's right hand, and found "no significant wrist region swelling." (*Id.*) He found Plaintiff had

"full grasp with good strength and full mobility of all digits." (*Id.*)  According to Dr. Pierson, Plaintiff had "evidence for Keinbocks's disease …with advanced radiolunate arthritis and mid carpal arthritis at the capitate-lunate articulation." (*Id.* at 83)  Because Plaintiff "demonstrate[d] good wrist function without pain," Dr. Pierson "recommended that she defer any type of surgical considerations for management of her right wrist until the level of pain increase[d] and [was] more constant and the level of disability increases." (*Id.*)

In September 2012, Plaintiff had an appointment with Dr. Watson regarding her sleep apnea. (Doc. 9-9 at 34)  She reported her symptoms were "improved," though she continued to have "irregular nighttime breathing." (*Id.*)

In October 2012, Plaintiff described "neuropathy and left knee pain," as well as "bilateral heel pain. (Doc. 9-9 at 30- 31)  Additional x-rays were taken on October 23, to be compared with the results from June 2012. (*Id.* at 3)  Dr. Miller determined the appearance of Plaintiff's knees was "similar to the prior exam." (*Id.*)  Specifically, Dr. Miller found "joint space narrowing and spurring, primarily involving the medial compartment of each knee, more severe on the left." (*Id.*)  She concluded Plaintiff had "[c]hronic degenerative changes" in her knees. (*Id.*)

Plaintiff reported she had "upper/lower back and right hip" pain in November 2012. (Doc. 9-10 at 9)  She said that she felt "some improvement" with the pain in her knees after losing about 25 pounds. (Doc. 9-9 at 78)  She said she was "limited in [walking] 2-3 blocks by her left knee discomfort primarily." (*Id.*)  Dr. Pierson observed that Plaintiff was not wearing the wrist splint he gave her, and found she "continue[d] to have limited wrist mobility without apparent change." (*Id.*)  Dr. Pierson gave Plaintiff an injection of "a combination of local anesthetic and Kenalog 40mg" in her left knee. (*Id.* at 79)

Dr. Watson completed a second residual functional capacity assessment on November 28, 2012. (Doc. 9-9 at 76-77)  The limitations identified he were identical to those indicated in the assessment from June 2012.[1] (*Compare* Doc. 9-8 at 57-58 *with* Doc. 9-9 at 76-77)

In December 2012, Plaintiff returned to her podiatrist, reporting she had "sharp" pain in her

---

[1] The first page of the residual functional capacity questionnaire is, in fact, a copy of the assessment previously offered by Dr. Watson.

heels.  (Doc. 9-10 at 3) Dr. Smalley observed that Plaintiff's gait was "normal on both sides."  (*Id.* at 4)  Dr. Smalley determined Plaintiff's sensation was intact in her foot, though she demonstrated some tenderness in her ankles.  (*Id.* at 5)

On February 23, 2013, Plaintiff visited Dr. Watson for a check-up with her diabetes, and requested assistance with "smoking cessation."  (Doc. 9-10 at 33, 39)  Dr. Watson noted Plaintiff's diabetes was stable, and he planned to start Plaintiff on nicotine replacement patches after she received a "NO-BUTTS certificate."  (*Id.*)

In March 2013, Dr. Pierson observed that Plaintiff "ambulate[d] without a significant antalgic limp."  (Doc. 9-10 at 20)  Plaintiff reported the steroid injection she received in November gave "a significant amount of relief," though her pain had "returned to a moderate level."  (*Id.*)  Because Plaintiff had a "good response to the injection," she requested another be given. (*Id.* at 21)  Dr. Pierson determined it was reasonable, and gave Plaintiff an injection "with Kenalog 40 mg and a limited amount of Lidocaine 2%."  (*Id.*)

## B.        Administrative Hearing Testimony

On April 19, 2013, Plaintiff appeared at the hearing before the ALJ.  (Doc. 9-3 at 41)  She testified that she had taken "some college" classes, though she did not earn a degree.  (*Id.* at 49)  Plaintiff reported she worked almost 13 years at a casino, where she last worked as "an executive assistance [sic] for the food and beverage department."  (*Id.*)  She said she lost her job in December 2009, due to "a massive budget cut and title eliminations."  (*Id.* at 50)

Plaintiff said that toward the end of her employment, she began experience medical conditions that prevented her from performing "certain duties."  (Doc. 9-3 at 50)  She explained it was difficult "[s]itting for a long period of time and being in the food and beverage department there [were] 10 different restaurants that [she] needed to work with and go to."  (*Id.*)  Plaintiff explained walking the "long stretch" between departments bothered her knees and feet, and sleep apnea caused her to "doze off at the computer."  (*Id.*)  Plaintiff reported the casino hired her daughter to be her assistant about a year before she was laid off, and her daughter "took over a lot of things" including filing and walking to the different restaurants.  (*Id.* at 51)  She believed that even if she had not been laid off, she could not have continued doing the job for "very much longer."  (*Id.* at 50-51)

1    She estimated she was able to be on her feet for 20 minutes before she needed to sit down.

2    (Doc. 9-3 at 52)  Plaintiff said that after 20 minutes, "My back will stiffen.  My knees will hurt.  My

3    feet will throb." (*Id.*)  She believed she would need to rest "a half hour or so" before she could return

4    to being on her feet.  (*Id.*)  Plaintiff reported her back, knees, and feet also bothered her when she

5    walked.  (*Id.*)  She estimated she could walk "[p]robably 15 minutes" at one time before she needed to

6    rest.  (*Id.*)

7    Plaintiff stated that her back also bothered her when she sat "for a long period time."  (Doc. 9-3

8    at 53)  She said she "often will change chairs and move from different chairs, kitchen chair, patio

9    chair," because "the movement seems to help."  (*Id.*)  She estimated she was able to sit for 20 minutes

10    at one time.  (*Id.*)  According to Plaintiff, the drive to the hearing was about an hour and a half, and

11    they pulled over for Plaintiff to take a break and walk around the car because she had a "shooting pain

12    going down [her] left side" from her back to her knees.  (*Id.* at 53-54)  Plaintiff said she was "never

13    without some pain." (*Id.* at 55)

14    In addition, Plaintiff said she suffered from diabetic neuropathy, which caused "hammer toes"

15    on both feet.  (Doc. 9-3 at 65)  Plaintiff explained she had "no control" over those toes, and the pads of

16    her feet felt like "pebbles in your shoes and walking on those" or like her "sock slipped down and

17    bunched up under there."  (*Id.*)  She stated that she wore "diabetic shoes" and used canes that were

18    "passed down" from her grandmother and great aunt.  (*Id.* at 65-66)  Plaintiff explained she lived "in a

19    mountainous area, and the properties are not level or concreted or blacktop," and using a cane helped

20    with her balance.  (*Id.* at 66)

21    She reported she tried to "go outside and walk around and get some kind of exercise" every

22    day.  (Doc. 9-3 at 56-57)  In addition, Plaintiff reported she used weights while sitting, and had a

23    treadmill in her living room that she used when "physically able." (*Id.* at 69) She said that she weighed

24    about 250 pounds, which was "high" for her, because her normal weight was "[p]robably 160, 180."

25    (*Id.* at 47)  Plaintiff attributed her weight gain to "[n]ot being able to move and exercise properly."

26    (*Id.* at 48)  She believed her weight was "a big factor in [her] medical condition as far as [her] knees

27    and feet go." (*Id.* at 68)

28    Plaintiff testified that she was able vacuum, dust, mop, sweep, and do laundry, though

10

sometimes it took "longer because [of her] medical condition." (Doc. 9-3 at 58)  She said her children, including one daughter that lived with her, would "take care of the yard and things that need to be done." (*Id.*)  Plaintiff reported she "sometimes" did the grocery shopping with her daughter, but other times she sent her kids with a list. (*Id.* at 59)  She explained that sometimes she needed to leave and sit in the car because of her pain, so her daughter would finish the shopping. (*Id.*)  In addition, Plaintiff said she would "get the lighter stuff," while her daughter carried "the heavier stuff." (*Id.* at 60)

She explained that her right hand was "weak" and she did not "have much movement in it." (Doc. 9-3 at 60)  Plaintiff reported she had pain in her wrist and writing, typing, using a knife, or using a computer mouse could cause her fingers to swell. (*Id.*)  She explained she would not use her right hand for things like lifting a gallon of milk out of the fridge, but instead "would use the left hand automatically." (*Id.* at 61)  She believed she could lift and carry up to 20 pounds occasionally. (*Id.*)

Vocational expert Linda Berkley (the "VE") also testified at the hearing.  The VE classified Plaintiff's past work at the casino "as a[n] administrative assistant," which had a sedentary exertional level and SVP of 7 under the *Dictionary of Occupational Titles*.[2] (Doc. 9-3 at 69-70)

The ALJ asked the VE to consider a hypothetical individual who was "restricted to somewhere between light and sedentary work, who needs to have a sit/stand option or the ability to sit and stand kind of almost at will." (Doc. 9-3 at 70)  In addition, the ALJ stated:

> [C]umulatively this individual can stand or walk four hours out of an eight-hour workday and can stand or walk four hours out of an eight-hour workday and can sit six hours out of an eight- hour workday.  So now this individual would need to use a cane for long distance walking or uneven terrain walking for more than 50 feet, for distance of more than 50 feet.  Lifting and carrying is limited to 20 pounds occasionally, 10 pounds frequently.  All postural activities can be done occasionally, climbing of ladders, ropes, scaffolding, stairs and ramps, kneeling, crouching, stooping, and balancing.  This individual would also need to avoid concentrated exposure that is continuous, intractable, persistent exposure to hazards, pulmonary irritants and to temperature extremes.

(*Id.*)  The ALJ added "crawling" to the list of postural activities and then asked the VE to consider all postural limitations at the "occasional" level.  (*Id.*)  The VE opined such a person would not be able to

---

[2] The *Dictionary of Occupational Titles* ("*DOT*") by the United States Dept. of Labor, Employment & Training Admin., may be relied upon "in evaluating whether the claimant is able to perform work in the national economy." *Terry v. Sullivan*, 903 F.2d 1273, 1276 (9th Cir. 1990). The *DOT* classifies jobs by their exertional and skill requirements, and may be a primary source of information for the ALJ or Commissioner. 20 C.F.R. § 404.1566(d)(1).

perform Plaintiff's past work because an administrative assistant "can't just sit and stand whenever they feel like it if they're working on a report deadline." (Doc. 70-71)  The VE explained that although there would be flexibility to sit and stand during the workday, "it wouldn't necessarily at will [or] whenever she decides to or felt like it." (*Id.*)  However, if the individual was able to "remain in one position for 30 minutes at a time," the VE opined she could perform Plaintiff's past work. (*Id.*)

Next, the ALJ asked the VE to consider an individual who "was restricted to less than eight hours during the workday in addition to the previous [limitations]." (Doc. 9-3 at 71)  The VE opined such a person would not be able to perform Plaintiff's "past work or any other work" because she "would not be able to work on a full-time basis." (*Id.* at 72)  The VE believed it was "conceivable that the hypothetical person in that position would have to work at times more than eight hours a day based on deadlines that may come up," so it was very "rare that an employer will [allow] part-time employment, even for a highly skilled position. (*Id.*)

Plaintiff's counsel asked the VE to consider an individual who was "limited to sedentary work … except they're going to be able to stand only for two of eight hours, sit for six of eight hours." (Doc. 9-3 at 73)  Plaintiff's counsel also asked the VE to consider:

> Same sit/stand option, every 30 minutes.  Same use of a cane, same lift 20 occasionally 10 frequently, same postural occasionally.  And then I'm going to add to it two more limitations.  They would be limited to occasional fine manipulation with the right hand, which is the dominant hand, and frequent gross manipulation with the right hand, which is the dominant hand.

(*Id.*)  The VE opined an individual with these limitations would not be able to perform Plaintiff's past relevant work because it "requires frequent computer work, which would require bilateral use of the hands." (*Id.*)  Further, the VE believed no jobs would be available in the national economy, because the limitation with fine manipulation precluded skilled office work as well as "unskilled sedentary work." (*Id.* at 73-74)

## C.    The ALJ's Findings

Pursuant to the five-step process, the ALJ determined Plaintiff did not engage in substantial activity after the alleged disability date of October 1, 2010. (Doc. 3-3 at 23)  Second, the ALJ found Plaintiff "has the following severe combination of impairments: diabetes mellitus with diabetic neuropathy; obstructive sleep apnea; exogenous obesity; a torn meniscus in bilateral knees and

1    osteoarthritis; a history of peptic ulcer disease; hypothyroidism; hepatitis; degenerative changes of the

2    right hip; arthritis in her right wrist; multilevel lumbosacral spondylosis; and spondylosis of the

3    thoracic spine." (*Id.*)  These impairments did not meet or medically equal a listed impairment. (*Id.* at

4    24)  Next, the ALJ determined:

> [T]he claimant has the residual functional capacity to perform light to sedentary work as
> defined in 20 CFR 404.1567(a) and (b) and 416.967(a) and (b): The claimant can remain
> in one position for thirty minutes at a time, and at most would need to change positions
> every thirty minutes; she can sit cumulatively for six hours out of an eight hour
> workday; she needs to use a cane for long distance walking or uneven terrain walking
> for distances of more than fifty feet; she can lift and/or carry twenty pounds occasionally
> and ten pounds frequently; she can occasionally climb, kneel, crouch, stoop, balance,
> and crawl; and she needs to avoid concentrate, which is continuous intractable persistent
> exposure to hazards, pulmonary irritants and temperature extremes.

10   (*Id.* at 24)  With this residual functional capacity, the ALJ found Plaintiff was "capable of performing

11   past relevant work as an administrative assistant." (*Id.* at 31)  Therefore, the ALJ concluded Plaintiff

12   was not disabled as defined by the Social Security Act. (*Id.* at 31-32)

### DISCUSSION AND ANALYSIS

14           Appealing the ALJ's decision, Plaintiff argues that the ALJ erred in rejecting the credibility of

15   her subjective complaints. (Doc. 15 at 17-19) In addition, the Plaintiff asserts the ALJ failed to

16   properly evaluate the medical evidence and define her residual functional capacity. (*Id.* at 12-17)

17   Accordingly, Plaintiff concludes the ALJ also erred in relying upon the testimony of the vocational

18   expert to conclude that she is capable of performing her past relevant work. (*Id.* at 20-21)

19   **A.     The ALJ's Credibility Determination**

20           When evaluating a claimant's credibility, an ALJ must determine first whether objective

21   medical evidence shows an underlying impairment "which could reasonably be expected to produce

22   the pain or other symptoms alleged." *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035-36 (9th Cir. 2007)

23   (quoting *Bunnell v. Sullivan*, 947 F.2d 341, 344 (9th Cir. 1991)).  Next, if there is no evidence of

24   malingering, the ALJ must make specific findings as to the claimant's credibility. *Id.* at 1036.  In this

25   case, the ALJ determined Plaintiff's "medically determinable impairments could reasonably be

26   expected to cause the alleged symptoms." (Doc. 9-3 at 26)  However, the ALJ found Plaintiff's

27   "statements concerning the intensity, persistence and limiting effects of the[] symptoms are not

28   entirely credible." (*Id.*)

13

An ALJ must base an adverse credibility determination on clear and convincing evidence where there is no affirmative evidence of a claimant's malingering and "the record includes objective medical evidence establishing that the claimant suffers from an impairment that could reasonably produce the symptoms of which he complains." *Carmickle v. Comm'r of Soc. Sec. Admin.*, 533 F.3d 1155, 1160 (9th Cir. 2008). Factors the ALJ may consider include, but are not limited to: (1) the claimant's reputation for truthfulness, (2) inconsistencies in testimony or between testimony and conduct; (3) the claimant's daily activities, (4) an unexplained, or inadequately explained, failure to seek treatment or follow a prescribed course of treatment and (5) testimony from physicians concerning the nature, severity, and effect of the symptoms of which the claimant complains. *Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989); *see also Thomas v. Barnhart*, 278 F.3d 947, 958-59 (9th Cir. 2002). To support an adverse credibility determination, the ALJ "must identify what testimony is not credible and what evidence undermines the claimant's complaints." *Lester v. Chater*, 81 F.3d 821, 834 (9th Cir. 1996).

In this case, the ALJ considered inconsistencies between Plaintiff's level of activity, inconsistencies in the record, the effectiveness of the treatment she received, and the objective medical evidence. (*See* Doc. 9-3 at 25-26) The Ninth Circuit has determined these may be relevant factors in assessing the credibility of a claimant. *See Fair,* 885 F.2d at 603; *Thomas*, 278 F.3d at 958-59.

### 1.      Level of activity

When a claimant spends a substantial part of the day "engaged in pursuits involving the performance of physical functions that are transferable to a work setting, a specific finding as to this fact may be sufficient to discredit a claimant's allegations." *Morgan v. Comm'r of the Soc. Sec. Admin.*, 169 F.3d 595, 600 (9th Cir. 1999) (citing *Fair*, 885 F.2d at 603). Here, the ALJ determined:

> The evidence shows the claimant has the ability to do laundry, vacuum, perform light household chores, shop for groceries with assistance, play ball for half hour a day with and care for her two dogs, attend to her personal hygiene, use a computer up to twenty minutes, prepare all family meals, drive, manage her medical care and appointments, utilize community resources for assistance with necessities, walk and sit up to a half hour each, read, throw darts for ten minutes, and work on stained glass projects for a half hour (Exhibits 3E; 8E; 5F; and hearing testimony).

(Doc. 9-3 at 26) The ALJ concluded "[t]hese activities are inconsistent with the claimant's allegations concerning the severity of her symptoms, and in fact indicate she is not as restricted in her activities as alleged." (*Id.*)

Plaintiff contends the ALJ erred in considering her level of activity, asserting that "[a] comparison of the ALJ's characterization of Plaintiff's testimony with her actual testimony in the transcript also shows that the ALJ oversimplified and, in some cases, blatantly misstated what Plaintiff actually reported." (Doc. 15 at 19, citing AR 25, 56-61 [Doc. 9-3 at 26, 57-63])

However, a review of the record and the reports cited by the ALJ indicates that the summary is, in fact, accurate. In Exhibit 3E, an undated pain questionnaire, Plaintiff reported she had reduced her activity and no longer took walks with her dogs, or groomed them, but was able to play with them each day. Specifically, she reported:

> Activities I do daily are reading for about a 15 minutes to half hour at a time, throwing darts for about ten minutes, throwing a ball for the dogs for a 15 minutes-half hour and have a hobby, I work on stainded [sic] glass projects off and on, through out the day for about 15-30 minutes.

(Doc. 9-7 at 18) Plaintiff also testified she was able vacuum, dust, mop, sweep, and do laundry, though sometimes it took "longer because [of her] medical condition." (Doc. 9-3 at 58) Similarly, she told Dr. Boparai that she was "able to do all cooking and cleaning," though it took her "an extended period of time." (Doc. 9-8 at 40) Finally, Plaintiff reported she was "independent with activities such as dressing, grooming, bathing toileting and hygiene," and "[s]he spends her day reading and caring for her two dogs." (*Id.*) These statements are consistent with the ALJ's summary of the record.

Notably, the Ninth Circuit has determined that "[e]ven where those activities suggest some difficulty functioning, they may be grounds for discrediting the claimant's testimony to the extent that they contradict claims of a totally debilitating impairment." *Molina v. Astrue*, 674 F.3d 1104, 1113 (9th Cir. 2012) (citing *Turner v. Comm'r of Soc. Sec.*, 613 F.3d 1217, 1225 (9th Cir. 2010); *Valentine*, 574 F.3d at 693)). For example, a claimant's ability to cook, clean, and manage finances may be sufficient to support an adverse finding find of credibility. *See Stubbs-Danielson v. Astrue*, 539 F.3d 1169, 1175 (9th Cir. 2008); *see also Morgan v. Comm'r of Soc. Sec.*, 169 F.3d 595, 600 (9th Cir. 1999) (ALJ's determination regarding claimant's ability to "fix meals, do laundry, work in the yard, and occasionally care for his friend's child" was a specific finding sufficient to discredit the claimant's credibility). Similarly, here, Plaintiff reported she was able to do household chores, throw darts, play with her dogs, read, and drive. Because her level of activity was inconsistent with her reports of

15

completely disability impairments, as the ALJ determined, this factor supports the adverse credibility determination.  *See Molina*, 674 F.3d at 1113; *Stubbs-Danielson*, 539 F.3d at 1175.

### 2.   Treatment received

When assessing a claimant's credibility, the ALJ may consider "the type, dosage, effectiveness, and side effects of any medication." 20 C.F.R. §§ 404.1529(c), 416.929(c).  Further, the treatment Plaintiff received, especially when conservative, is a legitimate consideration in a credibility finding. *Meanel v. Apfel*, 172 F.3d 1111, 1114 (9th Cir. 1999) (the ALJ properly considered the physician's failure to prescribe, and the claimant's failure to request, medical treatment commensurate with the "supposedly excruciating pain" alleged).  If a claimant's impairment "can be controlled effectively with medication," then it cannot be considered disabling.  *Warre v. Comm'r of Soc. Sec. Admin.*, 439 F.3d 1001, 1006 (9th Cir. 2006).

Here, the ALJ observed: "[T]he claimant's care has consisted in large part of routine follow up care to monitor her diabetes and pain." (Doc. 9-3 at 26)  In addition, the ALJ determined:

> [S]he reported knee injections, use of the CPAP machine, diabetic shoes, weight loss, dietary changes, increased physical activity, and proper body mechanics (Exhibits 3E; 8F; 12F; 20F; 23F; and 26F)  In fact, during a visit in November 2012, she reported doing "fine."  (Exhibit 23F pages 2 to 3).
>
> The evidence does not establish that the claimant had sought out, was advised to undergo, or was referred for a higher level of care for her impairments and symptoms.  Although, there was some indication in the evidence the claimant would need a knee replacement and surgery on her right wrist, there is no record in evidence of additional evaluations or follow through for this care.

(*Id.* at 26-27)  The ALJ concluded: "In light of this, it appears the claimant's symptoms are not as severe as alleged." (*Id.* at 27)

Plaintiff argues "the ALJ misconstrues the evidence" related to her "routine care for diabetes and pain, as well as [the fact] that Plaintiff was not referred for a higher level of care." (Doc. 15 at 17)  According to Plaintiff, she "readily testified that she has good control of blood glucose; however, there is evidence that she had ongoing neuropathy even with this control." (*Id.* at 18)  She asserts that "even though Plaintiff's primary care for pain was medication, there is ample evidence that Dr. Pierson was unable to find a medication that was effective at relieving pain." (*Id.*, citing AR at 231, 309, 313, 314, 443 [Doc. 9-8 at 4, 82, 86-87; Doc. 9-10 at 21])  Plaintiff asserts:

16

1      Plaintiff received multiple knee injections, which appeared to provide only temporary

2      relief since Plaintiff continued to report pain at future examinations. T 252, 254, 443.
Dr. Pierson did consistently indicate that Plaintiff was to get conservative treatment for

3      her knee first, but indicated on November 19, 2012 that Plaintiff "understands that if
she does not get sufficient relief from conservative treatment that the next option would

4      be to proceed with a total knee replacement." T 416. The only other treatment note with
Dr. Pierson after this one was at her scheduled three to four month follow up, during

5      which time Dr. Pierson was still attempting injections and anti-inflammatories before
more serious discussion about surgery. T 442-43.

6  (*Id.* at 18)  She concludes, "the evidence here indicates that Dr. Pierson was reluctant to recommend

7  surgery before all hope of relief from conservative treatments was exhausted," and "this is not quite the

8  same as a situation where more serious treatment is simply not warranted or necessary."  (*Id.*)

9      On the other hand, Defendant contends the ALJ properly considered that "Plaintiff obtained

10  relief from her treatment."  (Doc. 18 at 11, citing *Simon v. Colvin*, 749 F.3d 1106, 1107 (9th Cir. 2014)

11  ("The ALJ noted that [claimant's] testimony was inconsistent with the medical evidence showing

12  improvement and with [claimant's] daily activities that included regular golfing and socializing with

13  friends")).  Defendant observes: "Dr. Pierson informed Plaintiff that she would need reconstructive

14  knee surgery if pain injections and conservative treatment would not reduce her pain (AR 416). Four

15  months later, Plaintiff reported that she received a 'significant amount of relief' and her pain had not

16  returned to pre-injection levels (AR 442)."  (*Id.* at 11-12)

17      Significantly, the record supports the ALJ's conclusion that the treatment Plaintiff received

18  was effective, and that she was not referred for a higher level of care.  (*See* Doc. 9-3 at 26)  As the

19  ALJ observed, Plaintiff said she was doing "fine" and "reported some improvement from a 25 lb

20  weight loss" in November 2012.  (*Id.;* Doc. 9-9 at 78)  Plaintiff told Dr. Pierson that the injection she

21  received in November gave "a significant amount of relief," though her pain had "returned to a

22  moderate level" by the appointment four months later in March 2013.  (*Id.*)  Nevertheless, there is no

23  indication that Dr. Pierson believed surgery was necessary or appropriate in the most recent treatment

24  notes, despite Plaintiff's implication that it was a consideration.  Rather, Dr. Pierson clearly indicated

25  his "recommendation [was] to proceed conservatively."  (Doc. 9-10 at 21)  As in *Simon,* the record

26  indicates Plaintiff reported improvement with treatment, and the ALJ determined her testimony was

27  inconsistent with her level of activity.  *See id.*, 479 F.3d at 1107.  Accordingly, the treatment Plaintiff

28  received for her pain and neuropathy and its effectiveness support the adverse credibility

1    determination.  *See id.*; *see also* 20 C.F.R. §§ 404.1529(c), 416.929(c); *Meanel*, 172 F.3d at 1114.

2           3.     Conflicts with the medical record

3           In general, "conflicts between a [claimant's] testimony of subjective complaints and the

4    objective medical evidence in the record" can constitute "specific and substantial reasons that

5    undermine . . . credibility." *Morgan v. Comm'r of Social Sec. Admin.*, 169 F.3d 595, 600 (9th Cir.

6    1999).  The Ninth Circuit explained that "testimony cannot be rejected on the sole ground that it is not

7    fully corroborated by objective medical evidence," but "the medical evidence is still a relevant factor in

8    determining the severity of the claimant's pain and its disabling effects."  *Rollins*, 261 F.3d at 857.

9    Because the ALJ did not base the decision solely on the fact that the medical record did not support the

10   degree of symptoms alleged by Plaintiff, the objective medical evidence was a relevant factor in

11   determining Plaintiff's credibility.

12          However, if an ALJ cites the medical evidence as part of a credibility determination, it is not

13   sufficient for the ALJ to make a simple statement that the testimony is contradicted by the record.

14   *Holohan v. Massanari*, 246 F.3d 1195, 1208 (9th Cir. 2001) ("general findings are an insufficient basis

15   to support an adverse credibility determination").  Rather, an ALJ must "specifically identify what

16   testimony is credible and what evidence undermines the claimant's complaints." *Greger v. Barnhart*,

17   464 F.3d 968, 972 (9th Cir. 2006); *see also Dodrill v. Shalala*, 12 F.3d 915, 918 (9th Cir. 1993) (an

18   ALJ "must state which . . . testimony is not credible and what evidence suggests the complaints are not

19   credible").

20          In this case, the ALJ noted Plaintiff frequently had "overall … unremarkable physical

21   examination[s]," despite limitations with range of motion in her lower back and extremities "at times

22   during treatment." (Doc. 9-3 at 26)  For example, the ALJ observed that in May 2012, "it was noted her

23   diabetes was controlled, there was no evidence of edema in her extremities and overall her physical

24   examination was unremarkable."  (*Id.*, citing Doc. 9-8 at 64-80)  In addition, the record supports the

25   ALJ's determination that Plaintiff was often observed walking with a normal gait and intact sensation.

26   (*See* Doc. 9-3 at 26)  In May 2011, Dr. Smalley observed that Plaintiff's gait was normal, though she

27   reported a "cramping" pain that felt like "a wadded up sock." (Doc. 9-8 at 29)  Dr. Smalley again noted

28   Plaintiff's gait was "normal on both sides," and determined her sensation was intact in December 2012.

(Doc. 9-10 at 4)  In March 2013— the most recent treatment notes— Dr. Pierson indicated Plaintiff "ambulate[d] without a significant antalgic limp."  (Doc. 9-10 at 20)  Further, the ALJ noted that at the neurological examination, Dr. Boparai determined Plaintiff's "strength was 5/5 in upper and lower extremities" and "[s]he had intact sensation to pinprick versus dull discrimination in the upper and lower extremities and intact proprioception of the lower extremities."  (Doc. 9-3 at 30)

Because the ALJ met the burden to identify evidence in the record that undermined the credibility of Plaintiff's assertions, the objective medical record supports the adverse credibility determination. *See Greger*, 464 F.3d at 972; *see also Johnson v. Shalala*, 60 F.3d 1428, 1434 (9th Cir. 1995) (an ALJ may consider "contradictions between claimant's testimony and the relevant medical evidence").

### 4.    Plaintiff's obesity

Plaintiff asserts that "the ALJ consistently made note of physician's statements regarding the impact of her weight on her knees, the importance of weight loss for her health, and reported improvement of some pain with weight loss."  (Doc. 15 at 19)  According to Plaintiff,

> The ALJ also noted that Plaintiff lost weight in July and reported engaging in daily exercise, but her body mass index was still above the obesity threshold. T 26. At the hearing Plaintiff testified that she was following her diet for diabetes, eating multiple small meals as directed, and worked on her home treadmill and with seated weights when she felt physically able to do so. T 67-68. However, the ALJ's only response to this testimony of attempts to lose weight was to call her out for exercising only when she was physically able by indicating "it stands to reason that your weight would aggravate some of your symptoms, but it's kind of a Catch 22." T 68.

(*Id.*)  Plaintiff concludes "the ALJ's treatment of Plaintiff's obesity suggests that he implicitly held it against her credibility," and this was not a proper consideration as part of the credibility determination. (*Id.* at 19-20, citing *Orn v. Astrue*, 495 F.3d 625, 637 (9th Cir. 2007))

As Plaintiff contends, the ALJ observed that Plaintiff was advised to lose weight.  (*See* 9-3 at 27)  For example, the ALJ noted that in March 2012, two physicians reminded Plaintiff "of the importance of diet and exercise to control her impairments and symptoms," and that "she would notice relief with significant weight loss." (*Id.*, citing Doc. 9-8 at 77-79, 89)  However, the Ninth Circuit has determined that a "recommendation" to lose weight is not a prescribed treatment within the meaning of the Social Security Regulations without a prescribed diet. *Orn*, 495 F.3d at 637.  Consequently, a

1   claimant's failure to lose weight—despite being advised to do so by a treating physician—cannot be

2   considered a failure to follow a prescribed treatment.  *See id.*

3          Nevertheless, the ALJ met his burden of identifying other clear and convincing reasons

4   supporting the adverse credibility determination, which were "sufficiently specific to allow a reviewing

5   court to conclude the ALJ rejected the claimant's testimony on permissible grounds."  *Moisa v.*

6   *Barnhart*, 367 F.3d 882, 885 (9th Cir. 2004); *see also Thomas*, 278 F.3d at 958.  As such, the flawed

7   analysis regarding Plaintiff's obesity and failure to lose weight was a harmless error, because it "does

8   not negate the validity of the ALJ's ultimate credibility conclusion."  *Carmickle*, 533 F.3d at 1160

9   (quoting *Batson v. Comm'r of Soc. Sec. Admin*, 359 F.3d 1190, 1197 (9th Cir. 2004).

10  **B.      Evaluation of Dr. Watson's Opinion**

11         In this circuit, the courts distinguish the opinions of three categories of physicians: (1) treating

12  physicians; (2) examining physicians, who examine but do not treat the claimant; and (3) non-

13  examining physicians, who neither examine nor treat the claimant.  *Lester v. Chater*, 81 F.3d 821, 830

14  (9th Cir. 1996).  In general, the opinion of a treating physician is afforded the greatest weight but it is

15  not binding on the ultimate issue of a disability.  *Id.*; *see also* 20 C.F.R. § 404.1527(d)(2); *Magallanes*

16  *v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989).  Further, an examining physician's opinion is given more

17  weight than the opinion of non-examining physician.  *Pitzer v. Sullivan*, 908 F.2d 502, 506 (9th Cir.

18  1990); 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2).

19         A physician's opinion is not binding upon the ALJ, and may be discounted whether or not

20  another physician contradicts the opinion.  *Magallanes*, 881 F.2d at 751.  An ALJ may reject an

21  *uncontradicted* opinion of a treating or examining medical professional only by identifying "clear and

22  convincing" reasons.  *Lester*, 81 F.3d at 831.  In contrast, a *contradicted* opinion of a treating or

23  examining professional may be rejected for "specific and legitimate reasons that are supported by

24  substantial evidence in the record."  *Id.*, 81 F.3d at 830.  When there is conflicting medical evidence, "it

25  is the ALJ's role to determine credibility and to resolve the conflict."  *Allen v. Heckler*, 749 F.2d 577,

26  579 (9th Cir. 1984).  The ALJ's resolution of the conflict must be upheld by the Court when there is

27  "more than one rational interpretation of the evidence."  *Id.; see also Matney v. Sullivan*, 981 F.2d

28  1016, 1019 (9th Cir. 1992) ("The trier of fact and not the reviewing court must resolve conflicts in the

1   evidence, and if the evidence can support either outcome, the court may not substitute its judgment for

2   that of the ALJ").  Here, Plaintiff contends the ALJ erred in evaluating the opinions of Dr. Watson, her

3   treating physician.  (Doc. 15 at 12-16)  Because the limitations Dr. Watson assessed were contradicted

4   by Dr. Boparai, the ALJ was required to identify specific and legitimate reasons for rejecting Dr.

5   Watson's opinions.

6        The ALJ indicated he gave "little weight" to the opinions of Dr. Watson concerning the

7   Plaintiff's residual functional capacity.  (Doc. 9-3 at 31)  The ALJ determined that although the

8   opinions were "based upon a treatment relationship with the claimant," they were inconsistent with the

9   treatment notes and Plaintiff's level of activity, and unsupported by objective medical evidence.  (*Id.*)

10  The Ninth Circuit has determined these may constitute specific and legitimate reasons for giving less

11  weight to the opinions of treating physicians.  *See e.g., Tommasetti v. Astrue,* 533 F.3d 1035, 1041 (9th

12  Cir. 2008); (an opinion may be rejected where inconsistent with the treatment records); *Rollins v.*

13  *Massanari*, 261 F.3d 853, 856 (9th Cir. 2001) (holding an ALJ may give less weight to an opinion

14  where the claimant's level of activity exceeds the assessed limitations); *Magallanes v. Bowen*, 881 F.2d

15  747, 751 (9th Cir. 1989) (an opinion lacking the support of clinical findings may be rejected).

16       1.   Plaintiff's level of activity

17       Here, the ALJ observed that the "reported activities of the claimant" were inconsistent with the

18  opinions of Dr. Watson, who believed Plaintiff was limited to fine manipulation with her dominant

19  hand "25% of the day, and reaching 75% of the day."  (Doc. 9-3 at 30-31)  Specifically, the ALJ

20  observed that Plaintiff "reported she was independent in her activities of daily living, was able to get

21  outside several times a day to throw the ball for her two dogs, she could play darts for ten minutes, she

22  could work on stained glass projects for a half hour at a time, she could prepare meals, [and] she was

23  able to drive."  (*Id.* at 31)

24       The Ninth Circuit has determined an ALJ may reject an opinion when the physician sets forth

25  restrictions that "appear to be inconsistent with the level of activity that [the claimant] engaged in."

26  *Rollins*, 261 F.3d 853, 856 (9th Cir. 2001); *see also Fisher v. Astrue*, 429 Fed. App'x 649, 652 (9th

27  Cir. 2011) (concluding the ALJ set forth specific and legitimate reasons for rejecting a physician's

28  opinion where the assessment was based upon the claimant's subjective complaints, and limitations

identified by the doctor conflicted with the claimant's daily activities).  Because Plaintiff's reported

level of activity exceeded the limitations assessed by Dr. Watson, this was a specific and legitimate

reason to give less weight to his opinions.

### 2.    Lack of objective evidence

The ALJ observed that Dr. Watson's opinions lacked the support of "imagining studies [and]

clinical findings."  (Doc. 9-3 at 31)  Notably, Dr. Watson did not identify any objective medical

evidence or clinical findings to support his opinions.  (*See* Doc. 9-8 at 57-58; Doc. 9-9 at 76-77)

Significantly, the Ninth Circuit has determined an ALJ may reject reports of physicians "that

did not contain any explanation of the bases of their conclusion." *Crane v. Shalala*, 76 F.3d 251, 253

(9th Cir. 1996).  As the ALJ found, Dr. Watson's opinions were quite conclusory, and did not explain

his conclusion that Plaintiff's impairments caused the extreme limitations identified.  The lack of

explanation from Dr. Watson is a specific, legitimate reason supporting the ALJ's decision to give

"little weight" to the opinions. *See Crane*, 76 F.3d at 253; *see also Holohan v. Massanari*, 246 F.3d

1195, 1202 (9th Cir. 2001) ("the regulations give more weight to opinions that are explained than to

those that are not").

### 3.    Inconsistencies with treatment notes

The Ninth Circuit explained the opinion of a treating physician may be rejected where an ALJ

finds incongruity between a treating doctor's assessment and his own medical records.  *Tommasetti*,

533 F.3d at 1041; *Morgan v. Comm'r of the Soc. Sec. Admin.*, 169 F.3d 595, 603 (9th Cir. 1999)

(explaining inconsistencies supports the decision to discount the opinion of a physician).

Here, the ALJ observed that Plaintiff "presented with overall normal physical examinations

[and] her activities were not restricted by Dr. Watson or any other provider."  (Doc. 9-3 at 31) The

ALJ noted, as discussed above, that Plaintiff "reported and demonstrated overall improvement with

her symptoms and ability to function."  (*Id.*)  Because the ALJ determined the treatment notes were

inconsistent with the conclusions offered by Dr. Watson, the lack of support in the treatment notes

constitutes a specific and legitimate reason for giving less weight to the opinions. *See Thommasetti*,

553 F.3d at 1041; *see also Connett v. Barnhart*, 340 F.3d 871, 875 (9th Cir. 2003) (treating physician's

opinion properly rejected where the treating physician's treatment notes "provide no basis for the

1   functional restrictions he opined should be imposed on [the claimant]").

2   **C.      Plaintiff's Residual Functional Capacity**

3          When an ALJ rejects contradicted opinions of physicians, the ALJ must not only identify

4   specific and legitimate reasons for rejecting those opinions, but the decision must also be "supported by

5   substantial evidence in the record." *Lester*, 81 F.3d at 830.  Accordingly, because the ALJ articulated

6   specific and legitimate reasons for rejecting the opinion of Dr. Watson, the decision must be supported

7   by substantial evidence in the record.

8          The term "substantial evidence" "describes a quality of evidence ... intended to indicate that the

9   evidence that is inconsistent with the opinion need not prove by a preponderance that the opinion is

10   wrong."  SSR 96-2p, 1996 SSR LEXIS 9 at *8[3].  "It need only be such relevant evidence as a

11   reasonable mind would accept as adequate to support a conclusion that is contrary to the conclusion

12   expressed in the medical opinion."  *Id.*

13          Here, the ALJ gave "great weight" to the opinion of Dr. Boparai, who administered a

14   neurological consultative examination, in determining Plaintiff's residual functional capacity.  (Doc. 9-

15   3 at 29)  The ALJ noted Dr. Boparai determined Plaintiff's strength was "5/5."  (*Id.* at 30)  In addition,

16   Dr. Boparai found Plaintiff was "able to walk on her heals," but "was unable to hop or squat, and walk

17   on her toes."  (*Id.*)  Plaintiff was able to walk without assistance despite having "a globally antalgic

18   gait," and Dr. Boparai concluded Plaintiff should use a cane for long distance walking and assessed

19   postural limitations due to the pain in Plaintiff's knees and feet.  (*Id.*; *see also* Doc. 9-8 at 43)  The ALJ

20   determined Dr. Boparai's opinions were "consistent with the evidence in the record including the

21   claimant's testimony she can lift twenty pounds, her reported daily activities, clinical findings, imaging

22   studies and observations of providers in the treatment records."  (*Id.* at 29)

23          Though Plaintiff contends the ALJ erred by not including "manipulative limitations in

24   Plaintiff's use of right hand" in the residual functional capacity (Doc. 15 at 16), the decision to do so is

25

26          [3] Social Security Rulings (SSR) are "final opinions and orders and statements of policy and interpretations" issued by the Commissioner.  20 C.F.R. § 402.35(b)(1). Although they do not have the force of law, the Ninth Circuit gives

27   the Rulings deference "unless they are plainly erroneous or inconsistent with the Act or regulations."  *Han v. Bowen*, 882 F.2d 1453, 1457 (9th Cir. 1989); *see also Avenetti v. Barnhart*, 456 F.3d 1122, 1124 (9th Cir. 2006) ("SSRs reflect the official interpretation of the [SSA] and are entitled to 'some deference' as long as they are consistent with the Social

28   Security Act and regulations").

supported by the opinion of Dr. Boparai.  As the ALJ noted, Dr. Boparai determined Plaintiff's strength was "5/5."  (Doc. 9-3 at 30)  She also examined Plaintiff's wrist joints and range of motion, and did not find any abnormalities.  (*See* Doc. 9-8 at 42)  Rather Dr. Boparai explained the lifting and carrying limitations were "due to the fact that if [Plaintiff] is using a single point cane she only has one upper extremity available for lifting and carrying."  (*See id.* at 43)  These limitations were adopted by the ALJ, as were the postural limitations.  (*Compare* Doc. 9-3 at 24 *with* Doc. 9-8 at 42-43)

When the opinions of a physician "rest[] on independent examination," the opinions constitute substantial evidence. *Tonapetyan*, 242 F.3d at 1149; *see also Orn v. Astrue*, 495 F.3d 625, 632 (9th Cir. 2007) (when an examining physician provides independent clinical findings, such findings are substantial evidence).  Here, Dr. Boparai performed a neurological examination and offered conclusions based upon that examination.  Consequently, her conclusion that Plaintiff does not have manipulative limitations—and her only lifting and carrying limitations were due to the expected use of a cane— is substantial evidence that supports the residual functional capacity.

### D.      Reliance upon the Vocational Expert's Testimony

Plaintiff contends the ALJ erred by relying upon the testimony of the vocational expert to determine that she is able to perform her past relevant work at step four of the sequential evaluation. (Doc. 15 at 20-21)  At step four, a claimant has the burden of proof to establish that she cannot perform her past relevant work "either as actually performed or as generally performed in the national economy." *Lewis v. Barnhart*, 281 F.3d 1081, 1083 (9th Cir. 2002).  To determine whether a claimant may perform her past relevant work or other work in the national economy, the ALJ may call a vocational expert.  *See Lewis*, 281 F.3d at 1083; *Tackett v. Apfel*, 180 F.3d 1094, 1101 (9th Cir. 1999).

When eliciting testimony from a vocational expert, the ALJ must set forth "hypothetical questions to the vocational expert that 'set out all of the claimant's impairments' for the vocational expert's consideration." *Tackett*, 180 F.3d at 1101 (quoting *Gamer v. Sec'y of Health & Human Servs.*, 815 F.2d 1275, 1279 (9th Cir. 1987)).  Only limitations supported by substantial evidence must be included. *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 886 (9th Cir. 2006); *Osenbrock v. Apfel*, 240 F.3d 1157, 1163-65 (9th Cir. 2001).  "If the assumptions in the hypothetical are not supported by the record, the opinion of the vocational expert that the claimant has a residual working capacity has no

1    evidentiary value." *Gallant v. Heckler*, 753 F.2d 1450, 1456 (9th Cir. 1984).  When the "weight of the

2    medical evidence supports the hypothetical questions posed," the ALJ's findings will be upheld by the

3    court.  *Martinez v. Heckler*, 807 F.2d 771, 774 (9th Cir. 1987); *see also Gallant*, 753 F.2d at 1456.

4           Here, Plaintiff asserts the ALJ erred in relying upon the vocational expert' testimony to find that

5    Plaintiff is able to perform her past relevant work because the "the ALJ failed to include any limitation

6    in use of her right wrist despite evidence of such limitations and the ALJ's own finding that right wrist

7    osteoarthritis was a severe impairment." (Doc. 15 at 21)  In addition, Plaintiff contends the ALJ failed

8    to include the standing limitations assessed by Dr. Watson.  (*Id.*)  However, as discussed above, the

9    ALJ set forth specific and legitimate reasons for giving less weight to the opinion of Dr. Watson, and

10   the residual functional capacity was supported by substantial evidence.  Consequently, the ALJ was not

11   required to include the limitations assessed by Dr. Watson in the hypothetical questions posed to the

12   vocational expert.

13                                         **CONCLUSION AND ORDER**

14          For the reasons set for above, the Court finds the ALJ applied the proper legal standards and

15   resolved conflicts in the evidence.  Because the ALJ's decision is supported by substantial evidence in

16   the record, the Court must uphold the conclusion that Plaintiff was not disabled as defined by the Social

17   Security Act.  *Sanchez*, 812 F.2d at 510; *Matney*, 981 F.2d at 1019.

18          Accordingly, **IT IS HEREBY ORDERED**:

19          1.      The decision of the Commissioner of Social Security is **AFFIRMED**; and

20          3.      The Clerk of Court **IS DIRECTED** to enter judgment in favor of Defendant

21                  Carolyn W. Colvin, Acting Commissioner of Social Security, and against Plaintiff

22                  Veronica Campa.

23

24   IT IS SO ORDERED.

25      Dated:   __**March 21, 2016**__              _____**/s/ Jennifer L. Thurston**_____

26                                                  UNITED STATES MAGISTRATE JUDGE

27

28

                                                   25